IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBRA DUNCANSON, | |
| Plaintiff, | No. C 10-02898 JSW |
| v. | |
| ROYAL & SUNALLIANCE GROUP LIFE INSURANCE POLICY, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendant. | |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, | |
| Real Party In Interest. | |

Now before the Court is the bench trial in the above captioned matter. Having reviewed the administrative record, the extrinsic evidence properly before the Court, and the parties' arguments, and based on this Court's findings of fact, for the reasons set forth in the this Order, the Court concludes that Life Insurance Company of North America ("LINA") wrongfully determined that Plaintiff Debra Duncanson ("Duncanson") was no longer disabled under the terms of the group disability life insurance policy (the "Group Policy").

**BACKGROUND**

Duncanson was in car accident on January 24, 2003. After the car accident, she applied for and received disability benefits from her employer, Defendant Royal & SunAlliance ("Royal"). In connection with her claim, Duncanson applied to have her life insurance

1  premiums waived under the Group Policy, which is covered by the Employee Retirement
2  Income Security Act of 1974 ("ERISA"), 28 U.S.C. §§ 1001, *et seq*. The insurer of the Group
3  Policy, Real Party in Interest LINA, administered and initially approved Duncanson for the
4  waiver of premium benefit under the Group Policy and continued to provide these benefits to
5  her until July of 2009. In a letter dated July 15, 2009, LINA advised Duncanson that it no
6  longer considered her to meet the definition of disabled under the Group Policy and terminated
7  her waiver. (Administrative Record ("AR"), 116-120.)

8  The Group Policy provides that the premium will be waived and life insurance benefits
9  will continue if an employee's active service ends due to disability and the employee is under
10 age 60. (AR 1632.) The Group Policy further provides that:

> [i]n order to qualify for Waiver of Premium an Employee must submit due proof that he or she has been Disabled for the Benefit Waiting Period .... Such proof must be submitted to the Insurance Company no later than three months after the Employee satisfies the Benefit Waiting Period. Premiums will be waived from the date the Insurance Company agrees in writing to waive premiums for that Employee. After premiums have been waived for 12 months, they will be waived for future periods of 12 months, if the Employee remains Disabled and submits satisfactory proof that Disability continues. Satisfactory proof must be submitted to the Insurance Company 3 months before the end of the 12 month period.

16 (*Id.*)

17 The Group Policy defines disabled to mean "because of Injury or Sickness, [the
18 Employee] is unable to perform all the material duties of any occupation for which he or she
19 may reasonably become qualified based on education, training or experience." (AR 1644.)
20 This provision does not specify whether part-time work may satisfy this definition. However,
21 to the extent an Employee would not be disabled to due his or her ability to perform all the
22 material duties of an occupation on a part-time basis, the Policy appears to define part-time
23 work as a minimum of 25 hours and a maximum of 37.5 hours. (AR 1625.)

24 Since her car accident in 2003, Duncanson has seen numerous doctors and has been and
25 continues to take multiple medications for her pain and other symptoms. On September 2,
26 2004, Dr. John E. Carr, an orthopedic and hand surgery specialist provided a permanent and
27 stationary report for Duncanson's workers' compensation claim. (AR 1563.) He noted that she
28 had an MRI on May 1, 2003 which revealed, at C5-6 and C6-7, posterior disc osteophyte

causing central canal stenosis. Moderate to severe bilateral neural foraminal stenosis was seen at C5-6 and mild to moderate neural foraminal stenosis bilaterally at C6-7. Right neural foraminal stenosis was visualized at C3-4 and C4-5. (AR 1564.) Dr. Nelson, the neurologist who requested the MRI, recommended cervical spine surgery. (*Id*.)

Dr. Carr further reported that Duncanson consulted with Dr. Jennie Multani on November 26, 2003, who diagnosed her with C5-6 and C6-7 disc herniations with osteophytes resulting in central canal stenosis and bilateral carpal tunnel syndromes. Dr. Multani recommended anterior cervical discectomy and fusion at CD5-6 and C6-7. (AR 1564.)

Dr. Carr diagnosed Duncanson with musculoligamentous sprain of the cervical spine with associated stenosis C5-6, C6-7, bilateral carpal tunnel syndromes, bilateral radial nerve peripheral neuropathy Arcade of Frohse, bilateral rotator cuff tendonitis, right hand first metacarpal/carpal arthritis, and possible brachial plexitis. (AR 1565-66.) Dr. Carr provided Duncanson with Soma, Ranitidine, Tranzodone and Naprosyn medication. (AR 1566.) Dr. Carr imposed the following work restrictions: (1) "She has a bilateral upper extremity disability which ... should preclude prolonged or repetitive or stressful lifting, pushing, pulling, gripping, grasping, pinching, holding torquing, finger dexterity or other activities involving comparative physical effort;" (2) "She has a cervical spine disability precluding heaving lifting, stressful pushing and pulling activities;" and (3) "She has bilateral shoulder disability precluding prolonged or repetitive or stressful above the shoulder activities, as well as prolonged or repetitive or stressful pushing and pulling bilaterally." (AR 1567.)

Dr. Carr, as well as several other doctors, found that Duncanson was unable to work, even at a sedentary job. For example, on January 4, 2004, Dr. Carr found Duncanson to be permanently totally disabled and classified her with a Class 5 physical impairment, which is defined as "Severe limitations of functional capacity; incapable of minimal (sedentary) activity." (AR 485-86.) On May 5, 2005, Dr. Daniel Lopez also classified Duncanson with the same Class 5 physical impairment. (AR 430.) On May 4, 2007, Dr. Frauwirth made the same finding, and Dr. Ravi Panjabi made the same finding on May 23, 2008. (AR 331, 887.) Dr. Panjabi also found that he did not expect a fundamental or marked change in the future and

thought that Duncanson could never return to work. (AR 888.) On April 14, 2008, Dr. Douglas Grant opined that Duncanson could never return to work. (AR 265.) Dr. Frauwirth made the same findings. (AR 1118.) On May 5, 2005, Dr. Barbara A. McQuinn found Duncanson "Temporarily Totally Disabled." (AR 785.)

Dr. Daniel W. Meub, certified in neurosurgery, wrote a report dated June 17, 2009 and a supplemental report dated July 6, 2009. (AR 85-92.) In his supplemental report, Dr. Meub opined that "since Ms. Duncanson has been off work for some five years and has a multitude of conditions and symptoms the likelihood of her returning to gainful employment is not good." (AR 86.) Dr. Meub further opined "with reasonable medical certainty" that Duncanson would not be able to work, even in sedentary work with the opportunity to rest periodically during the day. (AR 86.) Dr. Meub noted that there had been a continued worsening of Duncanson's cervical degenerative disc disease with formation of increased osteophytes. Dr. Meub observed this continued worsening by comparing an MRI Duncanson had in May 2003 with an MRI she had in April 2008. (AR 86.) Dr. Meub found that her total impairment rating was at 44 percent. (AR 86.)

The Social Security Administration also found that Duncanson, as of December 17, 2003, was unable to work at any job in the national economy, and awarded monthly disability benefits to her. (AR 464.)

Despite this medical evidence, on July 15, 2009, based primarily on Dr. Stephen Dell's conclusions, LINA determined that Duncanson no longer qualified as disabled under the Group Policy. (AR 116-120.) Dr. Dell opined that Duncanson could conduct sedentary work. (AR 153.) However, this opinion considered only Duncanson's physical limitations and, thus, did not include her complaints regarding her pain. (Declaration of Lawrence F. Padway ("Padway Decl."), Ex. 5 at 13:23-14:6.) Dr. Dell testified that he had no reason to disbelieve what Duncanson told him regarding her level of pain and discomfort. (*Id*., Ex. 5 at 10:20-11:2.) He did not believe that she was exaggerating or being untruthful. (*Id*., Ex. 5 at 13:2-9.) Although he found that her degree of discomfort and duration of symptoms seemed to be out of proportion to the actual physical and imaging findings, he clarified that in the middle portion of

4

the curve (*i.e.*, where the imaging findings are not massive or very little to non-existent), correlation between the magnitude of the findings and the amount of pain is very poor. (*Id*., Ex. 5 at 14:12-15, 15:17-16:15.)

When considering Duncanson's level of pain and discomfort, Dr. Dell testified that her ability to work was affected as follows: "I'm sorry. Somebody who's in severe pain is hardly able to carry on working. That's fairly obvious." (*Id*., Ex. 5 at 11:3-9.) He further stated he would expect that her described symptoms would prevent her from working on a full-time basis. (*Id*., Ex. 5 at 13:10-16 ("She describes a host of symptoms, and they interfere with everything in life, including sleep and other functions. I can hardly believe that somebody in that situation can work on a full-time basis."); *see also* Ex. 5 at 31:6-12 (Q:...Doctor, at the time that you saw her and wrote this report, was it your opinion that she could perform a sedentary occupation? A: *Physically*, yes. If she is in such pain that she can do little or nothing, and her complaints of pain are really quite severe, then perhaps she simply can't get out of bed in the morning.") (emphasis added).) Dr. Dell testified that his diagnosis of Duncanson was that she "clearly has chronic pain syndrome or a chronic muscular skeletal syndrome. ... In addition, [she] has a variety of spondylotic changes .... [a]nd ... a traction, or torsion, or strain, or sprain type of a condition. " (*Id*., Ex. 5 at 19:25-20:20.)

Any additional facts will be addressed as necessary in the remainder of this order.

## ANALYSIS

The parties agree that *de novo* review applies. Pursuant to the parties' agreement and Federal Rule of Civil Procedure 52(a), the Court is conducting a bench trial based on the administrative record, as well as the extrinsic evidence submitted to the Court.

Under *de novo* review, the Court must determine whether Duncanson is entitled to receive the waiver of premium benefit without deference to either party's interpretation. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (Under de novo review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."). The Court will evaluate the persuasiveness of the conflicting testimony and decides which is more likely true. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.

5

1999). Therefore, the Court must determine whether Duncanson is "entitled to benefits based on the evidence in the administrative record and other evidence as might be admissible under the restrictive rule of *Mongeluzo [v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir. 1995)]." *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (internal quotation omitted). "[T]he district court should exercise its discretion to consider evidence outside of the administrative record *only* when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision." *Id.* (internal quotations omitted) (emphasis in original). The extrinsic evidence at issue here relates to the credibility of a medical expert, Dr. Dell. Because there is conflicting medical evidence in the record, the Court finds the evidence relating to the credibility of Dr. Dell is necessary to conduct an adequate *de novo* review of the benefits decision. *See Opeta*, 484 F.3d at 1217 (including issues regarding the credibility of medical experts in "a non-exhaustive list of exceptional circumstances where introduction of evidence beyond the administrative record could be considered necessary").

Duncanson bears the burden of showing by a preponderance of the evidence that she is entitled to benefits under the Group Policy. *See Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp.2d 1222, 1232 (N.D. Cal. 2003).

It is undisputed that Duncanson suffers from considerable amounts of pain. LINA has not questioned her credibility or pointed to any doctors who have questioned her credibility. In fact, LINA states: "The medical information clearly documents Ms. Duncanson's reports of severe, constant pain in multiple areas since her motor vehicle accident in 2003." (AR 13.) Since her car accident in 2003, Duncanson has seen numerous doctors and has been and continues to take multiple medications for her pain and other symptoms. As noted above, among those doctors, seven have found that Duncanson is unable to work, even at a sedentary job. Notably, the Social Security Administration was also persuaded that Duncanson, as of December 17, 2003, was unable to work at any job in the national economy, and awarded monthly disability benefits to her. (AR 464.) Although "Social Security disability awards do

6

not bind plan administrators, ... they are evidence of disability." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011).

LINA argues that "[o]f all the medical evidence before the Court, the Court must place greater weight on Dr. Dell's conclusions because his review and examination are comprehensive, his opinions are well-reasoned, and his conclusions are consistent with the majority of the medical evidence in the file that address's [Duncanson's] work capacity." (LINA's Mot. at 9.) LINA focuses the Court on Dr. Dell's conclusion that Duncanson's ability "to perform a sedentary occupation is preserved." (AR at 153.) He concluded that Duncanson could sit, reach at desk level, and reach below her waist for 2.5 to 5 hours in an 8 hour day and that she could stand, walk, grasp with her right and left hands, lift and carry up to ten pounds and push and pull between 5 and 10 pounds for two and a half hours or less in an eight hour day. (*Id*. at 155-56.)

However, as noted above, Dr. Dell clarified in his deposition that when he determined that Duncanson could conduct sedentary work, he was considering only her physical limitations, which did not include her complaints regarding her pain. (Padway Decl., Ex. 5 at 13:23-14:6.) Dr. Dell testified that he had no reason to disbelieve what Duncanson told him regarding her level of pain and discomfort. (*Id*., Ex. 5 at 10:20-11:2.) He did not believe that she was exaggerating or being untruthful. (*Id*., Ex. 5 at 13:2-9.) Moreover, Dr. Dell's determination that her degree of discomfort and duration of symptoms seemed to be out of proportion to the actual physical and imaging findings does not mean much in light of Dr. Dell's clarification that correlation between the magnitude of the findings and the amount of pain is very poor for the middle portion of the curve. (*Id*., Ex. 5 at 14:12-15, 15:17-16:15.)

When considering Duncanson's level of pain and discomfort, Dr. Dell testified that her ability to work was affected as follows: "I'm sorry. Somebody who's in severe pain is hardly able to carry on working. That's fairly obvious." (*Id*., Ex. 5 at 11:3-9.) He further stated he would expect that her described symptoms would prevent her from working on a full-time basis. (*Id*., Ex. 5 at 13:10-16, 31:6-12.) Dr. Dell testified that his diagnosis of Duncanson was that she "clearly has chronic pain syndrome or a chronic muscular skeletal syndrome. ... In addition,

1 [she] has a variety of spondylotic changes .... [a]nd ... a traction, or torsion, or strain, or sprain
2 type of a condition. " (*Id*., Ex. 5 at 19:25-20:20.)

3       LINA also relies heavily on the transferable skills analysis conducted by the
4 Rehabilitation Specialist Vince Engel, M.Ed., CRC, LPC. Engel concluded that there are jobs
5 available that Duncanson could perform. However, his conclusions were based on the
6 limitations and restrictions imposed by Dr. Dell. As explained above, Dr. Dell's conclusions
7 did not take into account Duncanson's credible complaints regarding her pain. Therefore, to the
8 extent Duncanson's ability to work is limited by her level of pain, Engel's conclusions are not
9 helpful.

10       Moreover, despite LINA's heavy reliance on Dr. Dell's medical conclusions, they fail to
11 address the significant evidence in the record which seriously undermines his credibility. In
12 light of Dr. Dell's diminished credibility and the fact that he did not consider Duncanson's
13 admittedly credible pain complaints, the Court gives more weight to the numerous doctors who
14 found Duncanson has severe functional limitations and is incapable of minimal (sedentary)
15 activity. Because Engel's conclusions are based on the limitations and restrictions imposed by
16 Dr. Dell, the Court similarly discounts Engel's findings. Moreover, the Court finds it
17 significant that the Social Security Administration also determined Duncanson was incapable of
18 performing any work in the national economy.

19       Although the Group Policy does not explicitly define "any work" to include part-time
20 work, LINA argues part-time work is included. As noted above, the Group Policy does not
21 specify whether part-time work may satisfy its definition of "any work." Moreover, LINA
22 failed to point to any evidence in the record, or even make any argument, regarding what would
23 constitute part-time work under the Group Policy. To the extent an employee would not be
24 disabled to due his or her ability to perform all the material duties of an occupation on a part-
25 time basis, the Group Policy appears to define part-time work as a minimum of 25 hours and a
26 maximum of 37.5 hours. (*Id*., Ex. C. at 8.) Regardless of whether the Group Policy includes
27 part-time work in its definition of "any work," the Court did not find any credible evidence in
28 the record which demonstrates that Duncanson, when considering her physical limitations and

symptoms, the amount of pain she suffers, and the numerous medications she takes, can perform all the material duties of an occupation which she may reasonably become qualified based on education, training or experience for at least 25 hours a week. Accordingly, the Court finds that Duncanson has carried her burden to prove that she is disabled under the Group Policy and entitled to the waiver of premium benefit under the Group Policy.

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of Duncanson and against LINA. LINA wrongfully determined that Duncanson was no longer disabled under the terms of the Group Policy. By no later December 6, 2011 than the parties shall meet and confer regarding the appropriate remedies to be awarded Duncanson. If the parties are in agreement, they shall submit a stipulation regarding the appropriate remedies by no later than December 8, 2011. If the parties cannot agree, by December 9, 2011, Duncanson shall submit a brief no longer than five pages to address the remedies which should be awarded to her. By no later than December 15, 2011, LINA may submit a responsive brief no longer than five pages.

**IT IS SO ORDERED.**

Dated: November 29, 2011



JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

9